David A. Fanning, OSB #088204
david@sawstop.com
9564 S.W. Tualatin Road
Tualatin, Oregon 97062
Phone: (503) 570-3200, Fax: (503) 570-3303
Attorney for Stephen Gass, SawStop, LLC and SD3, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **STEVEN SANTELLA** and **SONYA SANTELLA**, Plaintiffs, <br><br> v. <br><br> **GRIZZLY INDUSTRIAL, INC.,** Defendant. | Case No.: 3:12-MC-00131 <br><br> **SUBPOENAED ENTITIES' RESPONSE TO DEFENDANT'S MOTION TO COMPEL** |

Stephen Gass, SawStop, LLC, and SD3, LLC each received subpoenas from this court in connection with a product liability case pending in the Western District of Texas titled <u>Santella v. Grizzly</u>, 1:11-CV-00181-LY (W.D. Tex.). Gass, SawStop and SD3 are not parties to that case, though at plaintiff's request, Gass has agreed to testify as a fact witness and an unretained expert. The subpoenas are from defendant Grizzly Industrial. The subpoena to Gass commands the production of documents and his appearance at a deposition. The subpoenas to SawStop and SD3 command the production of documents. Gass, SawStop and SD3 responded by saying they would produce documents responsive to certain requests, they do not have documents responsive to other requests, and they object to still other requests. Gass also agreed to appear for a deposition. The parties discussed the disputed requests, but did not reach agreement. Grizzly then filed a motion to compel, and this is Gass, SawStop, and SD3's response.

Page 1 – Subpoenaed Entities' Response to Defendant's Motion to Compel

<u>Background</u>

In 1999 Stephen Gass invented technology to detect when a human hand contacts the spinning blade of a table saw. Upon detection, the saw takes some action to minimize injury, such as stopping or retracting the blade.

At the time of Gass' invention there was a tremendous need for safer table saws, and that need continues today. The U.S. Consumer Product Safety Commission estimates there are 67,300 medically treated table saw injuries to consumers every year costing society over $2 billion annually. Table saws, in contrast, cost from $250 to $500 on average (although some cost several thousand dollars), and the total annual retail market for table saws is around $200 to $400 million. Thus, on average, each table saw costs society five to ten times more in injury costs than the price of the saw itself. <u>See</u>, "Survey of Injuries Involving Stationary Saws, Table and Bench Saws, 2007-2008," March 2011, S. Chowdhury, Ph.D. and C. Paul, M.S., CPSC.

Beginning in late 1999 and continuing through the first half of 2002, Gass talked with many table saw manufacturers about licensing his technology. One of those manufacturers was Grizzly. Unfortunately, Grizzly, like other manufacturers, was unwilling to adopt the technology.

Gass eventually realized that his technology would never be available on table saws unless he made and sold table saws himself, so in the summer of 2002, Gass and two friends decided that is what they would do. They had previously formed two companies, SawStop, LLC to make prototype saws, and SD3, LLC to own patents protecting the technology. When they decided to make and sell table saws, they assigned their interests in SawStop to SD3, and then offered ownership interests in SD3 in exchange for capital. Around the beginning of 2003 they raised approximately $2 million from friends and family. Today, there are 35 members of SD3, SD3 owns 100% of SawStop, and Gass owns just under 20% of SD3.

SawStop designed a type of table saw called a contractor saw in 2002, then around the beginning of 2003, decided it would be better to manufacture a type of table saw called a cabinet saw. The design and initial manufacturing of the cabinet saw took about eighteen months. SawStop received its first production cabinet saws in the summer of 2004 and SawStop began selling those saws in August 2004. Today, SawStop table saws are the best-selling industrial table saws in the country.

Shortly after SawStop began selling saws, product liability attorneys started contacting Gass to ask if he would testify about his offers to license his technology to other manufacturers, the feasibility of incorporating his technology in various saws, and the effectiveness of the technology. Attorneys still regularly contact Gass and ask him to testify. Gass agrees to testify because tens of thousands of woodworkers are unnecessarily injured each year as a result of manufacturers' decisions not to adopt the technology, and because he is the only person with the knowledge and expertise willing to testify for injured woodworkers. Other experts with the relevant knowledge all work for power tool manufacturers. Gass, however, only testifies as an independent, unretained witness; Gass does not work for any attorney, does not conduct tests for any attorney, and is not compensated by any attorney. Gass is like a treating physician who testifies as an expert based on prior experience, but who does not work for a party.

Today, SawStop is aware of over 90 lawsuits in different jurisdictions around the country alleging table saws are defective for failing to include something like SawStop's technology. The underlying case against Grizzly is one of those lawsuits.

Grizzly has served each of Gass, SawStop and SD3 with a subpoena that includes 63 document requests. Copies of the subpoenas are attached as exhibit C to Grizzly's motion. The subpoenas seek almost every document SawStop and SD3 have, including all sales records, all

investment documents, all forecasts, all correspondence with manufacturers, all engineering drawings, all documents showing imports, all minutes of meetings, and literally over a hundred thousand emails spanning more than a decade. And Grizzly seeks all this from nonparties.

Because of their scope, Grizzly's subpoenas seem like an attempt to obtain confidential information from a competitor in retaliation for Gass' agreement to testify. Nevertheless, Gass, SawStop and SD3 have agreed to produce all of the documents concerning SawStop's dealings with Grizzly, all of the documents related to SawStop and SD3's offers to license their technology to other manufacturers, and all of the documents Gass relies on to support his testimony. They also have informed Grizzly they have no documents responsive to many requests. Some requests, however, seek confidential and trade secret information that is irrelevant or that has only tenuous relevance to the underlying lawsuit. Other requests seek information that would be unreasonably difficult to produce or that Grizzly could obtain independently. Accordingly, Gass, SawStop and SD3 object to these requests as imposing an undue burden and as seeking confidential information.

<u>Legal Standards - Undue Burden</u>

FRCP 45(c)(3)(A)(iv) requires a court to quash or modify a subpoena that subjects a person to undue burden. Courts weigh several factors when deciding whether a subpoena imposes an undue burden, including "(1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed." <u>Wiwa v. Royal Dutch Petroleum Co.</u>, 392 F.3d 812, 818 (5th Cir. 2004). Courts also consider the factors set forth in FRCP 26(b)(2), such as whether the information sought can be obtained from some other source. <u>See</u>, <u>e.g.</u>, <u>Linder v. Calero-</u>

Portocarrero, 180 F.R.D. 168, 174 (D.D.C. 1998). Additionally, courts consider whether the person subject to the subpoena is a nonparty, and if so, that weighs against disclosure. Beinin v The Center for the Study of Popular Culture, 2007 WL 832962 (N.D.Cal. 2007) ("Courts balance the need for discovery against the burden imposed on the person from whom documents are sought, and the status of the person as a nonparty is a factor that weighs against disclosure. Compelling Mock, a nonparty witness, to comply with the Center's request for the requested documents would inflict costs and burdens disproportionate to whatever minimal evidentiary value the documents might have."); see also, Dart Industries Co., Inc. v. Westwood Chemical Co., Inc., 649 F.2d 646, 649 (9th Cir. 1980) ("While discovery is a valuable right and should not be unnecessarily restricted … the 'necessary' restriction may be broader when a nonparty is the target of discovery.")

### Legal Standards - Confidential Information

FRCP 45(c)(3)(B)(i) allows a court to quash or modify a subpoena that requires the disclosure of trade secrets or other confidential research, development, or commercial information. In deciding this question, courts consider whether the information sought is, in fact, confidential and whether "its disclosure might be harmful." Centurion Industries, Inc. v. Warren Steurer and Associates, 665 F.2d 323, 325 (10th Cir. 1981). If so, then the party seeking the information has the burden to establish that the information sought "is relevant and necessary." Hartley Pen Co. v. U.S. Dist. Court, 287 F.2d 324, 331 (9th Cir. 1961).  In short, courts balance the need for the information against the potential harm from disclosure. A protective order can sometimes be used to reduce the potential harm from disclosure, but "a protective order does not absolve [a party] from showing that the information sought is relevant." Cacique, Inc. v. Robert Reiser & Co., Inc., 169 F.3d 619, 622 (9th Cir. 1999).

Protective Order

In this case, the objected requests impose an undue burden and should be quashed, so no protective order is necessary. The requests seek information that is uniformly considered confidential, for example, engineering and manufacturing trade secrets, sales and financial records, investment documents, and business plans and policies. The disclosure of that information would harm SawStop by facilitating Grizzly's development, pricing and marketing of competitive saws. Accordingly, Grizzly must show that the information sought is sufficiently necessary and relevant to the underlying litigation to outweigh the significant potential harm to SawStop. Grizzly has not met that burden. As discussed below, the information Grizzly seeks has either no relevance or only a tenuous relevance to the underlying litigation. Therefore, the disputed requests should be quashed and there is no need for a protective order.

If, however, the court determines that Grizzly's need for confidential information outweighs the potential harm to SawStop, then a protective order would be necessary. In that case, SawStop and SD3 propose the protective order attached as exhibit 1. Grizzly, on the other hand, proposes a protective order prepared by the parties for the underlying litigation. Grizzly's proposed protective order, however, is governed by the Western District of Texas, and that court does not have jurisdiction over Gass, SawStop or SD3. Accordingly, that protective order cannot apply to them without their consent; and they do not consent because doing so would mean they would have to travel to Texas to enforce the order should a dispute arise. Additionally, the protective order in the underlying action was written to protect Grizzly, not nonparty competitors to Grizzly. If a protective order is needed, Gass, SawStop and SD3 request this court to adopt the attached protective order, and they request an opportunity to explain why the terms of that protective order are necessary.

<u>Argument</u>

In its motion, Grizzly addressed the subpoenas and objections generally without identifying or discussing specific document requests. Addressing specific requests, however, focuses the dispute and shows why some requests are objectionable. Accordingly, each request is addressed below.

Requests 1-4, 7 and 63 seek documents related to Gass' testimony. All such documents will be produced.

Requests 5 and 6 seek publications, invoices and payments. There are no responsive documents.

Requests 8-10 seek contracts between SawStop or SD3 and Woodcraft, Rockler, and dealers. These requests are objectionable, but there are no responsive documents.

Request 11 seeks documents concerning "a minimum advertised price for SawStop products." The only document responsive to this request is a document that sets forth SawStop's resale price maintenance policy and SawStop's dealer guidelines. SawStop's resale price maintenance policy and dealer guidelines, however, are irrelevant to the underlying litigation because the policy and guidelines have no affect on whether it was technically feasible for Grizzly to have implemented the SawStop technology by August 2003 when the saw at issue was manufactured. Technical feasibility turns on science and engineering, and is established by SawStop publicly demonstrating prototype saws with the technology in August 2000.

SawStop's policy and guidelines also have no affect on whether it was economically feasible for Grizzly to have implemented something like the SawStop technology. Economic feasibility turns on a cost versus benefit analysis, i.e., whether the benefits of the technology outweigh the costs of implementing the technology, and SawStop's policy and guidelines do not

affect or change those costs or benefits in any way. In fact, SawStop's resale price maintenance policy and dealer guidelines did not even exist when Grizzly rejected SawStop's technology, or when the saw that injured plaintiff was manufactured and purchased.

SawStop's policy and guidelines are also irrelevant to the effectiveness of the SawStop technology in mitigating injuries, and to Gass' offer to license his technology to Grizzly. Moreover, Gass does not rely on SawStop's policy and guidelines to support his expected testimony. Accordingly, this request imposes an undue burden and should be quashed. In fact, given the clear irrelevance to the underlying litigation, this request appears to be an attempt to obtain confidential information in retaliation for Gass' agreement to testify.

Requests 12 and 13 seek contracts and correspondence with a number of engineering design firms and independent engineers. Grizzly argues these documents are relevant to the issue of whether it was feasible for Grizzly to have implemented the SawStop technology in their saws by August 2003. SawStop acknowledges the requested documents might have some tenuous relevance to the issue of feasibility, but on balance, SawStop asserts the requests nonetheless impose an undue burden. Some background information is necessary to understand this issue. SawStop publicly demonstrated actual prototype saws with the technology at a trade show in Atlanta in August 2000. After that demonstration, the question became whether it was reasonable for manufacturers to implement the technology in saws sold to consumers. Over the next two years SawStop negotiated with many manufacturers do to just that. Grizzly and other manufacturers, however, ultimately chose not to adopt the technology, so around the beginning of 2003, SawStop decided to make and sell its own saws. About 20 months later, in August 2004, SawStop started selling saws. And that is what is relevant to the underlying lawsuit - the fact that SawStop started selling saws. And that is also what makes the relevance of Grizzly's

requests tenuous because the contracts and correspondence that Grizzly seeks in no way change the undisputed fact that SawStop started selling saws. In other words, regardless of what the contracts and correspondence say - even if they say SawStop recognized a limitation or risk with the technology - the fact of the matter remains that SawStop started selling saws in August 2004 and those saws have effectively mitigated injuries like the one plaintiff suffered.

On the other hand, the contracts and particularly the correspondence include many trade secrets and a tremendous amount of know-how that Grizzly could misappropriate to make and sell its own saws. SawStop would have no way to know if Grizzly did so, even if a protective order were adopted. Accordingly, the potential harm to SawStop is great, while the possible relevance of the information to the underlying litigation is tenuous. Moreover, Grizzly can easily hire its own engineering and manufacturing experts to testify whether it could have come out with a production saw by August 2003 after learning of the SawStop technology in 1999. Those experts would rely on Grizzly's engineering and manufacturing capabilities, not on SawStop's confidential engineering information.

The requested contracts and correspondence also have little if any bearing on economic feasibility because economic feasibility turns on a cost/benefit analysis. SawStop acknowledges the requested contracts and correspondence might show some incremental costs, for example, the cost of hiring an engineer to design a circuit. But what is relevant in determining economic feasibility is the total cost, not the incremental costs, and Gass can testify during his deposition to the total costs, all of which were well within the $2 million SD3 raised. More importantly, Grizzly can hire its own experts to testify about the costs of implementing the technology, and those experts can testify to the costs Grizzly would have incurred.

The requested contracts and correspondence are also irrelevant to the effectiveness of the SawStop technology in mitigating injuries, and to Gass' offers to license his technology. Additionally, Gass does not rely on any of the requested contracts or correspondence to support his anticipated testimony. Request 13 is also overly broad because it requests "all correspondence" over a multi-year period without limitation. See, e.g., Moon v. SCP Pool Corp., 232 F.R.D. 633, 637 (C.D. Cal. 2005) (subpoena imposed an undue burden because it sought documents over a 10 year or greater period and because it sought documents "regarding *all* pool winter covers, not only those 'within the Far East Region.'").

Finally, requests 12 and 13 must be viewed in light of the subpoenas in their entireties. Grizzly's subpoenas seek all sales records, all investment documents, all forecasts, all correspondence with manufacturers, all engineering drawings, all documents showing imports, all minutes of meetings, and literally over a hundred thousand emails spanning more than a decade. As stated, the scope of the subpoenas raises the question whether Grizzly is retaliating against SawStop because Gass agreed to testify for plaintiff. Tellingly, Grizzly has not subpoenaed any other table saw manufacturer even though other manufacturers were designing saws with similar technology in the early 2000s and therefore would have similar documents. Such manufacturers include Black & Decker, Bosch, Makita, Ryobi and Delta, as well as a joint venture managed by an industry association called the Power Tool Institute. Grizzly's focus on SawStop supports the conclusion that Grizzly is retaliating. For all these reasons, SawStop believes requests 12 and 13, on balance, impose an undue burden.

Requests 14-16 seek documents given to investors and related correspondence. SD3 has two "Offering Packages" that were given to investors, one around the beginning of 2003 and the other in the fall of 2004, and some correspondence. These documents, however, are irrelevant to

the underlying litigation because the terms of investment in SD3 have no bearing on whether it was technically and economically feasible for Grizzly to implement the SawStop technology in table saws. As stated, technical feasibility is shown by the existence of actual saws, and economic feasibility is shown by a cost/benefit analysis. Grizzly, however, says the offering packages might disclose risks associated with implementing the SawStop technology, which presumably Grizzly could use to try and justify its rejection of the technology. But risks identified in the offering packages, if any, are irrelevant to Grizzly's decision to reject the technology because Grizzly made that decision without seeing the offering packages and even before the offering packages existed. Additionally, Grizzly can hire its own experts to identify risks that might justify its rejection of the technology. Moreover, Gass does not rely on the offering packages to support his expected testimony. On the other hand, the offering packages include confidential business information, such as plans for future products, and the disclosure of that information could significantly harm SawStop. Accordingly, the requests impose an undue burden and should be quashed.

Requests 17-21 seek "all documents" showing annual sales, forecasts, projections, and financial models since 2004. These documents are irrelevant to the underlying litigation because they do not make technical or economic feasibility more or less likely. In other words, whether SawStop sold few or many saws does not affect whether Grizzly could have adopted the technology. Grizzly says the documents are relevant to feasibility, but does not explain how. Perhaps SawStop's financial records would have some relevance to economic feasibility if they suggested saws equipped with the SawStop technology were unprofitable. But that is not the case; SawStop saws are profitable and that fact is undisputed. Grizzly even says SawStop "makes the highest margin in the table saw industry." (Grizzly's Amended Brief, fn. 5.)

Moreover, Gass does not rely on these requested documents to support his anticipated testimony, and the requests are overly broad because they seek "all documents" over a multi-year time period. See, e.g., Moon v. SCP Pool Corp., 232 F.R.D. 633, 637 (C.D. Cal. 2005).

Grizzly also says it needs SawStop's financial records to show bias, but Grizzly is wrong. Gass admits his income is primarily from SD3 and SawStop, and Grizzly does not need SawStop's financial records to depose Gass about his income. Grizzly also does not need SawStop's financial records to depose Gass about whether he has benefited from his testimony in other table saw cases, or whether he expects to benefit from his testimony in the underlying action. Additionally, the cases cited by Grizzly to support its argument about bias are clearly distinguishable because they involve retained experts who are paid for their testimony. The situation here is different; Gass is an unretained expert, he is not hired to testify, he does not work for any attorney, and he is not paid.

Requests 17-21 also seek highly confidential financial information which Grizzly could use to set prices for its own saws. The scope of these requests again indicates that Grizzly is seeking confidential information in retaliation for Gass agreeing to testify. For all these reasons, these requests impose an undue burden.

Requests 22-25 seek documents concerning SawStop's market share. These requests are objectionable, but there are no responsive documents.

Requests 26-29 seek documents concerning Grizzly and SawStop's dealings with Grizzly. These requests are objectionable, but SawStop will produce its entire file on Grizzly.

Request 30 seeks "all minutes of meetings of SawStop LLC and/or SD3's [sic] prepared since January 1, 2004." The only documents responsive to this request are minutes of annual meetings. Those minutes, however, are irrelevant because they do not make technical or

economic feasibility more or less likely for the same reasons discussed above. Grizzly says the minutes might show "the progress of the development of SawStop from the initial prototype into a commercially feasible product." (Grizzly's Amended Brief, p 6.) But the wording of the request is not so limited; if it were, SawStop and SD3 would have no responsive documents. The minutes prepared after January 1, 2004 were prepared after SawStop's saw was already designed, so the minutes do not show a progress of development, as speculated by Grizzly. On the other hand, the minutes reveal plans for future products, business negotiations with other entities, and financial information, all of which is highly confidential. Additionally, Gass does not rely on any minutes to support his expected testimony. Again, the scope of this request suggests that Grizzly is trying to obtain confidential information about a competitor. Accordingly, this request imposes an undue burden.

Request 31 seeks all emails to Jacky Lin. From the end of 2002 through the beginning of 2006, Lin was SawStop's primary contact at the Taiwanese company that first manufactured saws for SawStop. In 2006 SawStop hired Lin as its Taiwan manager and he currently holds that position. The requested emails do not make technical or economic feasibility more or less likely for the reasons given above, and Gass does not rely on any of the requested emails to support his anticipated testimony. Moreover, the request is overly broad because it seeks "all emails" over a period of about 10 years without identifying any email specifically. There are over 65,000 emails between SawStop and Lin, and it would be an unreasonable burden on SawStop to review and produce those emails. Moreover, Grizzly has not given any specific reason why it needs these emails. On the other hand, the emails contain many trade secrets and substantial know-how that Grizzly could misappropriate to make and sell its own saws (e.g., engineering tolerances,

material choices, vendor and supplier names, test data, manufacturing methods, etc.). For all these reasons, this request imposes an undue burden.

Requests 32 and 33 seek audited financial statements. These requests are objectionable, but Gass, SawStop and SD3 have no audited financial statements.

Requests 34-36 seek "power point presentations" used to solicit investors. These requests are objectionable, but there are no "power point presentations."

Request 37 seeks budgets. This request is objectionable, but there are no responsive documents.

Request 38 seeks timelines concerning the time to design, test and produce saws. There are no responsive documents.

Request 39 seeks documents and reports "concerning non-human activation of the cartridge and brake on any table saw." SawStop has no such reports and SawStop does not compile that information because the occurrences of such activations are relatively rare and insignificant to SawStop's business. For background, SawStop's brake cartridge is the component that stops the blade in the event of an accident. The cartridge will activate when something with a conductivity and capacitance similar to a human body contacts the blade. Accordingly, if a user accidentally puts a metal tape measure against the blade, or if a user inadvertently cuts a piece of aluminum without bypassing the safety system, the cartridge will activate. SawStop's service records include reports of such activations, but those service records are neither grouped nor tallied. Finding those specific service records would require looking through individual records from 2004 to the present, and would be a significant and time consuming task. Instead of SawStop searching service records, Grizzly can depose Gass about "non-human activations" if Grizzly believes such activations are relevant. Gass also does not rely

Page 14 – Subpoenaed Entities' Response to Defendant's Motion to Compel

on any service records to support his anticipated testimony, and SawStop's service records are confidential. For these reasons, this request imposes an undue burden.

Requests 40 and 41 seek all notes of meetings with Taiwanese manufacturers. Any such notes are irrelevant because they do not make technical or economic feasibility more or less likely for the reasons given above, and because Gass does not rely on them for his testimony. This request is also overly broad because it seeks "all notes" without limit to any specific time period or any specific product – the requests are not even limited to table saws. The notes also include confidential engineering and manufacturing information which Grizzly could use to manufacture saws. For these reasons, this request imposes an undue burden and again suggests that Grizzly is trying to obtain confidential information unrelated to the underlying litigation.

Requests 42, 43, 45 and 46 seek drawings related to the initial and second SawStop prototypes. These requests are objectionable, but there are no responsive documents other than drawings in patents which Grizzly can obtain from the U.S. Patent & Trademark Office.

Requests 44 and 47 seek drawings related to prototype saws made after 2000. These requests are irrelevant because the requested drawings have no bearing on technical or economic feasibility for the reasons explained above, and Gass does not rely on any such drawings to support his anticipated testimony. The requests are also overly broad because they seek "all" drawings of "any" prototype saw, and therefore, encompass prototype saws currently in development. These requests are not even limited to table saws. These requests also seek highly confidential information that Grizzly could misappropriate to make saws, and it would be very difficult if not impossible for SawStop to prove that Grizzly did so. Accordingly, these requests impose an undue burden and suggest that Grizzly is trying to obtain confidential information from a competitor.

Requests 48-52 seek contracts relating to prototype saws and Taiwanese manufacturers. These requests are objectionable, but given that there are few responsive documents, SawStop will produce them with confidential information redacted.

Requests 53 and 54 seek all correspondence with a manufacturer called Geetech and with "the maker of SawStop cartridges in Taiwan." These requests are irrelevant because the requested correspondence has no bearing on technical or economic feasibility for the reasons given above, and because Gass does not rely on any such correspondence to support his anticipated testimony. The requests are also overly broad because they seek "all correspondence" over a multi-year period; the requests are not even limited to table saws. Additionally, there are literally tens of thousands if not a hundred thousand emails between SawStop, Geetech and the company making brake cartridges for SawStop, and those emails are stored on many different computers and tape backups. It would impose an unreasonable burden on SawStop to review and produce all those emails. The correspondence also includes much confidential engineering and manufacturing information which Grizzly could misappropriate to manufacture saws. Accordingly, these requests impose an undue burden, and further suggest that Grizzly is trying to obtain confidential information from a competitor unrelated to the underlying litigation.

Request 55 seeks all Customs documents relating to SawStop's imports since 2004. These requests are irrelevant because the requested documents have no bearing on technical or economic feasibility and Gass does not rely on any import documents to support his testimony. The requests are also overly broad because they seek "all" documents over a multi-year period; the requests are not even limited to imports of table saws. Additionally, Customs documents from prior years are in storage and would be difficult to retrieve. This request also seeks confidential business information from a competitor (e.g., the number, type, and timing of

imports), and is one more example of Grizzly using discovery to retaliate against SawStop. For these reasons, this request imposes an undue burden.

Requests 56 and 57 seek lists and costs of tools and dies owned by SawStop. These requests are irrelevant because the requested documents have no bearing on technical or economic feasibility and Gass does not rely on the documents to support his testimony. Indeed, Grizzly already manufactures table saws and knows what tools and dies are required to make saws equipped with the SawStop technology. Alternatively, Grizzly can hire experts or contact its own manufacturers to obtain the information, if necessary. There simply is no reason for Grizzly to demand a list of SawStop's tools and dies, unless Grizzly was trying to misappropriate confidential manufacturing information to more easily make its own saws. Accordingly, these requests impose an undue burden and should be quashed.

Request 58 seeks the ownership interest "of each shareholder of SD3 and SawStop, LLC." The requested information is irrelevant because it does not make technical or economic feasibility more or less likely, Gass does not rely on the requested information to support his testimony, and Grizzly does not explain why it seeks such information. This request also seeks confidential personal information. Accordingly, the request imposes an undue burden. Were the request limited to Gass' ownership interest, then at least there would be some relevance to the underlying litigation because Gass' interest might show bias. To address the issue of Gass' possible bias, the following information is provided: SD3 owns 100% of SawStop, and Gass owns just under 20% of SD3.

Requests 59 and 60 seek emails from SawStop to the U.S. Consumer Product Safety Commission (CPSC) and notes from meetings and phone calls with the CPSC. SawStop has emails but producing them would impose an undue burden because the emails are irrelevant to

technical or economic feasibility, because Gass does not rely on them to support his expected testimony, and because Grizzly could obtain the emails independently from the CPSC through a Freedom of Information Act request. SawStop also has a few notes from meetings, but the notes were made by attorneys as part of their work for SawStop or SD3, and therefore are privileged.

Request 61 seeks documents concerning Whirlwind Tool. This request is objectionable, but responsive documents will be produced.

Request 62 seeks any complaint filed against Gass, SawStop or SD3. This request is objectionable, but responsive documents will be produced.

Respectfully submitted,

Date: __March 11, 2012_____          s/ David Fanning_____
                                          David Fanning, OSB #088204
                                          david@sawstop.com
                                          Phone: (503) 570-3200
                                          Attorney for Gass, SawStop and SD3

Exhibit 1

David A. Fanning, OSB #088204
david@sawstop.com
9564 S.W. Tualatin Road
Tualatin, Oregon 97062
Phone:  (503) 570-3200, Fax:  (503) 570-3303
Attorney for Stephen Gass, SawStop, LLC and SD3, LLC


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| **STEVEN SANTELLA** and **SONYA SANTELLA**,<br>    Plaintiffs,<br><br>    v.<br><br>**GRIZZLY INDUSTRIAL, INC.,**<br>    Defendant. | Case No.: 3:12-MC-00131<br><br>**(PROPOSED) PROTECTIVE ORDER** |


1.    <u>Subject Matter</u>

This Protective Order governs three subpoenas issued from this court in connection with

a case titled <u>Santella v. Grizzly</u>, Civil Action No. 1:11-CV-00181-LY, pending in the U.S.

District Court for the Western District of Texas. The subpoenas were signed by James D.

Meadows, Esq., of Balch & Bingham, 30 Ivan Allen Jr. Blvd., NW, Suite 700, Atlanta, Georgia,

on February 23, 2012. One subpoena was addressed to Stephen F. Gass, Ph.D., in Tualatin,

Oregon; another was addressed to Stephen F. Gass, Ph.D., Manager, SD3, LLC, also in Tualatin;

and the third was addressed to Stephen F. Gass, President, SawStop, LLC, in Tualatin. The

subpoena to Gass commands the production of documents and his appearance for a deposition.

The subpoenas to SawStop and SD3 command the production of documents.

2.    <u>Definition of Confidential Information</u>

As used herein, the phrase "confidential information" means trade secrets and other confidential research, development and commercial information of Gass, SawStop, or SD3. Such information may include but is not limited to the following categories:

- customer and end-user names, phone numbers, addresses, and other contact information,

- analyses or reports of customer categories or types, i.e., education, government, schools, businesses, individuals, etc.

- sales numbers and sales information,

- financial information such as revenue, costs, expenses and margins,

- research and development information, such as measurements, experiments, calculations, analyses, tests, data and designs relating to product performance, product features, and new products,

- engineering information,

- warranty and service information,

- manufacturing information, contacts, costs and plans,

- business, marketing and licensing plans and policies, and

- intellectual property plans, analyses, and non-public filings.

Additionally, any and all documents, information and things containing a description, review or summary of any portion of confidential information, including attorney notes, writings, abstracts, summaries, and work product, shall be treated as confidential information.

3.    Designation of Confidential Information During Gass' Deposition

Gass, SawStop, SD3, or an attorney representing one or more of them, may designate portions of Gass' deposition testimony that concern confidential information as "CONFIDENTIAL." The designations shall be made during the deposition by requesting the reporter to designate portions of the transcript as "CONFIDENTIAL."

4.    Attendance at Confidential Portions of the Deposition

Attendance at "CONFIDENTIAL" portions of the deposition shall be limited to the deposition officers, Gass, David A. Fanning, Esq., and outside attorneys for the parties, provided they agree in writing to be subject to this Protective Order by signing a copy of this Protective Order, and further provided they are not involved in the non-litigation business decisions or actions of any power tool manufacturer or power tool retailer. Others may attend "CONFIDENTIAL" portions of the deposition with the approval of SawStop, provided they agree in writing to be subject to this Protective Order by signing a copy of this Protective Order. Each person attending a "CONFIDENTIAL" portion of the deposition, excluding Gass and Fanning, attests that the person is not involved in the non-litigation business decisions or actions of any power tool manufacturer or power tool retailer.

5.    Copies of the Transcript and Recording

Gass' deposition will be recorded by stenographic and/or videographic means only. The stenographic means shall result only in stenographic notes and a written transcript. The written transcript may be in a paper copy and/or an electronic copy. Any electronic copy of confidential portions of the written transcript shall be in a format that prohibits editing, printing and saving, such as certain Adobe PDF formats. No electronic copy of confidential portions of the written transcript shall be produced in Microsoft Word format or any other format that permits editing,

printing and saving. Additionally, each electronic copy of confidential portions of the written transcript shall include an unalterable digital signature or watermark that uniquely identifies the copy. Notwithstanding the above, the deposition officer producing the stenographic notes may make a temporary recording for assistance in preparing the written transcript, if necessary, and the recording shall be permanently erased, destroyed and discarded after the written transcript is prepared. The videographic means, if employed, shall result only in a video recording. Any video recording of confidential portions of the deposition shall be in a format that prohibits editing, copying and saving. Only persons attending confidential portions of the deposition may order written transcripts or video recordings of the "CONFIDENTIAL" portions.

6.    Designation of Confidential Documents

Gass, SawStop, SD3, or an attorney representing one or more of them, may designate documents produced in response to the above-identified subpoenas that contain confidential information as "CONFIDENTIAL." The designations shall be made by placing the word "CONFIDENTIDAL," or some other equivalent indication, in a margin of each such document when produced, or by notifying the parties in writing of such designation within 14 days after learning that a document contains confidential information. Each person or entity who receives written notice that a document contains confidential information shall thereafter use best efforts to maintain the document confidential, to retrieve all copies of the document if it has been disseminated beyond those authorized under this Protective Order to receive confidential information, and to limit its further disclosure in accordance with this Protective Order.

7.    Disclosure of Confidential Documents

"CONFIDENTIAL" documents shall be produced only to persons authorized under section 4 to attend confidential portions of the Gass deposition.

Page 4 – Exhibit 1 – (Proposed) Protective Order

8.      Further Disclosure of Confidential Information

No person receiving confidential information shall disclose it to any other person or entity, including representatives of the parties, without the prior written approval of SawStop or SD3, which approval may be requested as set forth in the following paragraph, and without that person or entity first agreeing in writing to be subject to this Protective Order by signing a copy of this Protective Order. Notwithstanding the prior sentence, outside attorneys for the parties may disclose confidential information to the following: 1) attorneys and staff members employed in their respective offices, provided each such attorney or staff member agrees in writing to be subject to this Protective Order by signing a copy of this Protective Order and sending the signed copy to SawStop and SD3, and further provided each such attorney or staff member is not involved in the non-litigation business decisions or actions of any power tool manufacturer or power tool retailer, and 2) judges, employees and/or jurors of the U.S. District Court for the District of Oregon, the U.S. District Court for the Western District of Texas, and any appellate court to which an order or judgment from this court is properly appealed, or to which a final judgment in the Santella v. Grizzly action is properly appealed, provided any such disclosure is made pursuant to a court order consistent with this Protective Order that maintains the confidentiality of the information and that prevents any further use or disclosure of the information.

9.      Requests for Further Disclosure

Any person receiving confidential information may request written approval from SawStop and SD3 to disclose confidential information to some other person or entity, such as an expert witness. Any such request shall be in writing and shall set forth the basis for the request. If SawStop and SD3 deny the request, then the person making the request may bring a motion

before the U.S. District Court for the District of Oregon. The U.S. District Court for the District of Oregon will be the sole venue for resolving these issues. Any approval to disclose confidential information to some other person or entity, whether the approval is from SawStop, SD3, or by court order, shall be contingent on the other person or entity agreeing in writing to be subject to this Protective Order by signing a copy of this Protective Order. The requesting person shall not make any disclosure of confidential information to the other person or entity until after sending SawStop and SD3 a copy of the signed Protective Order. SawStop and SD3 agree to keep confidential and not disclose the existence, name, qualifications, or other identifying information of any such consultant or expert unless such information is or becomes known to the public through no fault of Gass, SawStop or SD3.

10.    <u>Use of Confidential Information</u>

Any and all confidential information shall be used solely for the <u>Santella v. Grizzly</u> action; no portion of the confidential information shall be used for any other purpose. Use of confidential information in pretrial proceedings and at trial shall be contingent upon entry by the court having jurisdiction over the case of a protective order consistent with this Protective Order that maintains the confidentiality of the information and that prevents any further use or disclosure of the information.

Nothing in this Protective Order shall restrict the use of information that (i) is public knowledge; (ii) becomes public knowledge other than as a result of a violation of this Protective Order or by other unlawful means; (iii) was already known to the receiving party under conditions such that its use and/or public disclosure by the receiving party would not violate some obligation to another, which knowledge is established by pre-production documentation; or (iv) has come or shall come into the receiving party's legitimate possession independently of

Gass, SawStop or SD3 under conditions where its use and/or public disclosure by the receiving party would not violate some obligation to another.

      11.    <u>Requests to Designate Information as Non-Confidential</u>

      Any person receiving confidential information may request written approval from SawStop or SD3 to designate the information as non-confidential and not subject to the restrictions of this Protective Order. Any such request shall be in writing and shall set forth the basis for the request. If SawStop or SD3 denies the request, then the person making the request may bring a motion before the U.S. District Court for the District of Oregon. The questioned information shall remain confidential and subject to the restrictions set forth herein pending resolution of the motion. The U.S. District Court for the District of Oregon will be the sole venue for resolving these issues.

      12.    <u>Irreparable Harm Presumed From Unauthorized Use or Disclosure</u>

      Any unauthorized use or disclosure of confidential information will irreparably and significantly damage SawStop and SD3, irrespective of whether the unauthorized use or disclosure results from negligence, recklessness, inadvertence, or some other cause. Notwithstanding the prior sentence, the accidental disclosure of confidential information to an attorney or staff member from an office of an attorney receiving confidential information who has not agreed in writing to be bound by the terms of this Protective Order will not irreparably and significantly damage SawStop and SD3, provided such attorney or staff member has not disclosed or used the confidential information contrary to the terms of this Protective Order, provided such person agrees in writing to be bound by the terms of this Protective Order by signing a copy of this Protective Order as soon as reasonably possible after the accidental disclosure is discovered, provided that SawStop and SD3 are notified of the accidental disclosure

as soon as reasonably possible after the accidental disclosure is discovered and are given a copy
of the signed Protective Order, and further provided such attorney or staff member is not
involved in the non-litigation business decisions or actions of any power tool manufacturer or
power tool retailer.

13.   Notice of Unauthorized Use or Disclosure

In the event any person or entity subject to the terms of this Protective Order learns of
any possible unauthorized use or disclosure of any confidential information, that person or entity
shall promptly notify SawStop and SD3 and shall make all reasonable efforts to stop any further
unauthorized use or disclosure.

14.   Damages for Unauthorized Use or Disclosure

The damage to SawStop and SD3 from unauthorized use or disclosure of confidential
information will be difficult if not impossible to quantify. Therefore, the unauthorized use or
disclosure of confidential information, or any portion thereof in any degree, shall result in an
award to SawStop and/or SD3 equal to the greater of (1) actual damages, or (2) $100,000.00 for
each separate unauthorized use or disclosure. The parties who sign this Protective Order agree
that the $100,000.00 amount represents an estimate of actual damages and is not punitive.
SawStop or SD3 may recover these damages by bringing an action in the U.S. District Court for
the District of Oregon, or if an action is not possible in the U.S. District Court for the District of
Oregon, then in an appropriate state court in Oregon, and the persons and entities subject to this
Protective Order consent to jurisdiction and venue in these courts.

Notwithstanding the foregoing paragraph, a showing that the confidential information
allegedly used or disclosed in an unauthorized manner was not, in fact, confidential, shall be a
complete bar to any action by SawStop or SD3 to recover monetary damages under this section

of the Protective Order. The burden of proving that confidential information was not, in fact, confidential shall be on the person making the assertion. If monetary damages are barred under this paragraph, a violation of this Protective Order may still be punishable as contempt of court and may still be grounds for sanctions.

Additionally, notwithstanding the prior two paragraphs, only actual damages, if any, shall be recoverable for accidental disclosure of confidential information to an attorney or staff member from an office of an attorney receiving confidential information if such person has not disclosed or used the confidential information contrary to the terms of this Protective Order, if such person agrees in writing to be bound by the terms of this Protective Order by signing a copy of this Protective Order, and if such person is not involved in the non-litigation business decisions or actions of any power tool manufacturer or power tool retailer.

15.    Injunctive Relief for Unauthorized Use or Disclosure

In the event of unauthorized use or disclosure of confidential information, SawStop and SD3 shall be entitled to a temporary restraining order, preliminary injunction, and permanent injunction enjoining any further unauthorized use or disclosure of the confidential information. SawStop or SD3 may seek injunctive relief by bringing an action in the U.S. District Court for the District of Oregon, or if an action is not possible in the U.S. District Court for the District of Oregon, then in an appropriate state court in Oregon, and the persons and entities subject to the terms of this Protective Order consent to jurisdiction and venue in these courts. The person or entity making the unauthorized use or disclosure of confidential information shall also be liable for reasonable attorney fees and costs incurred in enjoining the unauthorized use or disclosure of confidential information.

16.   <u>Privileged Material</u>

This Protective Order shall not preclude Gass, SawStop, or SD3 from withholding any information or thing on the basis of the attorney-client privilege or attorney work-product doctrine, or otherwise affect a claim of privilege with respect to any information or thing. The inadvertent disclosure of any privileged information or thing shall not be deemed a waiver of such privilege. An inadvertent disclosure includes any unintentional or accidental disclosure, irrespective of whether the disclosure was careless, reckless, or negligent. Further, this Protective Order shall not preclude Gass, SawStop, or SD3 from withholding any information or thing the disclosure of which might constitute a breach of an agreement with a third party. Any disputes concerning whether information is subject to the attorney-client privilege or attorney work-product doctrine, or whether information should be disclosed which might constitute a breach of an agreement with a third party, shall be resolved in the U.S. District Court for the District of Oregon.

17.   <u>Subpoenas</u>

In the event any person or entity to whom confidential information has been disclosed receives a subpoena or other process or order to produce any portion of the confidential information, the subpoenaed person or entity shall:

(a)     within five business days, give notification in writing of such fact to SawStop and SD3, and furnish SawStop and SD3 with a copy of such subpoenas, process, or order;

(b)     provide reasonable cooperation to SawStop and SD3 with respect to any procedure instituted by SawStop or SD3 to prevent the use, disclosure or copying of the

confidential information, including seeking all reasonable extensions of time to afford SawStop and SD3 an opportunity to obtain appropriate judicial relief;

      (c)     object to each such subpoena, process or order; and

      (d)     not disclose any confidential information except upon order of a court having jurisdiction over the matter, and then only in accordance with such order or process.

18.    <u>No Waiver</u>

Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the exercise of, or failure to exercise, any rights created by this Protective Order, shall constitute a waiver of any right to seek or obtain protection or relief.

19.    <u>Disposition of Documents at Termination of Litigation</u>

At the conclusion of the <u>Santella v. Grizzly</u> action, any and all persons and entities to whom confidential information was produced under this Protective Order shall, promptly and at their expense, collect all confidential information and return it to SawStop and SD3 in a reasonable manner agreeable to SawStop and SD3. Sealed records containing confidential information which have been filed with a court, if any, shall be removed by the person or entity submitting them within ninety (90) days after a final decision is rendered if no appeal is taken, or within thirty (30) days after final disposition of an appeal, and promptly returned to SawStop and SD3 at the expense of the person or entity who submitted the records to the court.

20. <u>Jurisdiction and Forum for Dispute Resolution</u>

This Protective Order shall be governed by the law of the U.S. District Court for the District of Oregon, where applicable, and otherwise by the laws of Oregon, without consideration of its conflicts of law principles. Any and all disputes and actions concerning this Protective Order shall be brought and resolved exclusively in the U.S. District Court for the District of Oregon and the persons and entities subject to this Protective Order submit to the jurisdiction and venue of this court for all matters related to this Protective Order. Parties to this Protective Order are authorized to submit confidential information to this court under seal to the extent necessary to resolve disputes under this Protective Order.

21. <u>This Protective Order to be Part of Deposition Record</u>

This Protective Order shall be designated as an exhibit to the Gass deposition and shall be included in all confidential portions of the transcript.

SO ORDERED.


_____
United States District or Magistrate Judge


Submitted by:

<u>s/ David Fanning</u>
David Fanning, OSB #088204
david@sawstop.com
SawStop, LLC
9564 S.W. Tualatin Road
Tualatin, OR 97062
Phone: (503) 570-3200
Fax: (503) 570-3303
Attorney for Gass, SawStop, and SD3

The following persons and entities have read and understand the Protective Order set forth above governing three subpoenas issued from the U.S. District Court for the District of Oregon in connection with a case titled <u>Santella v. Grizzly</u>, 1:11-CV-00181-LY, pending in the Western District of Texas, and they agree to be subject to the Protective Order:

Signature: _____        Signature: _____

Name:_____        Name: _____

Date: _____        Date: _____


Signature: _____        Signature: _____

Name:_____        Name: _____

Date: _____        Date: _____


Signature: _____        Signature: _____

Name:_____        Name: _____

Date: _____        Date: _____


Signature: _____        Signature: _____

Name:_____        Name: _____

Date: _____        Date: _____


Additional signature pages may follow.

PROOF OF SERVICE

I certify that a true copy of the foregoing "Subpoenaed Entities' Response to Plaintiff

Grizzly's Motion to Compel" with "Exhibit 1 – (Proposed) Protective Order" was served upon

the following persons via first class mail and email to the specified addresses on the date set

forth below.

Jeffrey Shelly
jshelly@bsfllp.com
Boies, Schiller & Flexner LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Attorney for Plaintiffs

Kenneth J. Abere, Jr.
kabere@cosgravelaw.com
Gosgrave Vergeer Kester LLP
888 SW Fifth Ave., Suite 500
Portland, OR 97204
Attorney for Defendant


Date:   March 11, 2012

s/ David Fanning
David A. Fanning, OSB #088204
david@sawstop.com
9564 S.W. Tualatin Road
Tualatin, OR 97062
Phone: (503) 570-3200
Fax: (503) 570-3303
Attorney for Gass, SawStop and SD3