IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **STEVEN SANTELLA** and **SONYA SANTELLA,** | Case No. 3:12-mc-00131-SI |
| Plaintiffs, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **GRIZZLY INDUSTRIAL, INC. f/k/a Grizzly Imports, Inc.,** | |
| Defendant, | |
| v. | |
| **SAWSTOP, LLC; SD3, LLC;** and **STEPHEN F. GASS, PH.D.,** | |
| Subpoenaed Entities. | |

Jeffrey Steven Shelly, BOIES, SCHILLER AND FLEXNER, Albany, New York. Attorney for Plaintiffs.

James D. Meadows, BALCH & BINGHAM, LLP, Atlanta, Georgia; and Kenneth J. Abere, Jr., COSGRAVE VERGEER KESTER, LLP, Portland, Oregon. Attorneys for Defendant.

David A. Fanning, SAWSTOP, LLC, Tualatin, Oregon. Attorney for Subpoenaed Entities.

**SIMON, District Judge**.

This action involves discovery disputes arising out of third-party subpoenas served on three related entities in Oregon by the defendant in a federal court lawsuit in Texas. The Court previously granted in part and denied in part a motion to compel brought by Defendant against these Subpoenaed Entities. There were then four additional discovery disputes pending before this Court. The Court's September 26, 2012 Amended Opinion and Order resolved the first three (Doc. 40.) An evidentiary hearing was held on September 24, 2012, to determine whether Defendant's expert witness could be given access to the Subpoenaed Entities' confidential information. Doc. 39. For the reasons discussed below, Defendant's motion to compel is further GRANTED in part, allowing Mr. Peter Domeny, Defendant's expert witness, access to the Subpoenaed Entities' documents, including those marked "Attorneys' Eyes Only."

## BACKGROUND

Plaintiffs Steven and Sonya Santella ("Plaintiffs") sued Defendant Grizzly Industrial, Inc. ("Grizzly" or "Defendant") in a products liability action in federal court in Austin, Texas (the "Texas Lawsuit"). The Texas Lawsuit is styled *Steven and Sonya Santella v. Grizzly Industrial, Inc. f/k/a Grizzly Imports, Inc.,* Civil Action No. 1-11-CV-00181-LY (W.D. TX). In the Texas Lawsuit, Grizzly caused subpoenas to be issued by the federal court in Oregon and served on three related non-parties, SawStop, LLC, SD3, LLC, and Stephen F. Gass, Ph.D. (collectively "SawStop" or the "Subpoenaed Entities"). Grizzly's subpoenas required the production or inspection of responsive documents in Oregon, where all three Subpoenaed Entities reside. The Subpoenaed Entities objected to certain requests contained in Grizzly's subpoenas. Grizzly then commenced this miscellaneous action under

Fed. R. Civ. P. 45(c)(2)(B)(i), seeking an order compelling discovery. Doc. 1. The Court granted in part and denied in part Grizzly's motion to compel. Doc. 13.

On June 19, 2012, the Court signed a stipulated, two-tiered protective order.  This protective order, among other things, limits the circumstances under which independent consultants and expert witnesses retained by a party may have access to information marked "Confidential" or "Attorneys' Eyes Only." Doc. 16, at page 6, paragraph 9. Grizzly has retained as its independent consultant and testifying expert Mr. Peter Domeny. The Subpoenaed Entities timely objected. The Court held an evidentiary hearing on September 24, 2012, (Doc. 18), on the issue of whether Grizzly may disclose SawStop's "Confidential" or "Attorneys' Eyes Only" material to Grizzly's designated expert Mr. Domeny. [1] Mr. Domeny has agreed to be bound by the terms of the protective order, but SawStop, joined by Plaintiffs, argues that if Mr. Domeny gains access to SawStop's confidential information, then SawStop faces a substantial risk of competitive harm.  Grizzly responds that the information SawStop seeks to protect is not within the scope of Rule 26(c), but even if it were, Mr. Domeny's agreement to be bound to the terms of the protective order will eliminate any reasonable risk of competitive harm to SawStop.   Grizzly adds that it would suffer substantial prejudice if it is unable fully to rely on Mr. Domeny.

///

///

///

///

---

[1] Grizzly seeks to provide Mr. Domeny with access to the following categories of SawStop's documents: (1) documents that evince brake cartridge activations; (2) agreements with outside engineers, vendors, and manufacturers; (3) engineering emails from 2000 through 2006; and (4) documents that reveal component part pricing and cost information. Grizzly's Post-Evidentiary Hearing Notice 2–4. Doc. 41.

Page 3 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

## DISCUSSION

I.      **Findings of Fact**

      A.      **Background**

1.     The Court has heard and evaluated the testimony of Mr. Domeny and finds him to be

      credible.

2.     Skil Corp. ("Skil") and Robert Bosch Tool Corp. ("Bosch") employed Mr. Domeny in

      various capacities from 1969 through January 2009. Mem. Supp. Subpoenaed Entities'

      Mot. for Limited Disc. (Doc. 20), Ex. 1 ("SawStop's Mot. Limited Disc.). Mr. Domeny

      retired as Bosch's Director of Product Safety. *Id.*

3.     Mr. Domeny acted and intends to continue to act as a litigation consultant for Bosch and

      other power tool manufacturers. Grizzly's Pre-Evidentiary Hr'g Br., Ex. C, Domeny

      Aff. ¶ 3 (Doc. 31) ("Grizzly's Pre-Hr'g Br."). In 2011, Mr. Domeny billed Bosch

      Management Services more than $170,000 for his consulting work. Tr. 34–35. [2]

4.     Except for outside litigation consulting work, Mr. Domeny does not anticipate working

      again for Bosch. Tr. 35.

5.     In the last year, Mr. Domeny had some contact with current employees of Bosch. For

      example, Mr. Domeny was on an early September 2012 conference call with Mr. Tom

      Siwek, Director of Product Safety at Bosch, and has spoken to him regarding litigation in

      which Bosch is involved. Tr. 38–39.

6.     Mr. Domeny is a member of the American National Standards Institute ("ANSI")

      Technical Advisory Group ("TAG"), and he personally funds his participation in that

---

[2] All references to the September 24, 2012 Hearing Transcript will be notated as "Tr."

group from his consulting work. Mr. Domeny does not receive remuneration for his work with ANSI. Tr. 36–37.

**B.    The Power Tool Institute**

7.    The Power Tool Institute ("PTI")[3] is an industry organization that represents the interests of manufacturers of power tools. Membership in the PTI is limited to business entities, which are represented by their employees. Tr. 45, 59.

8.    The PTI opposes regulations mandating the inclusion of active injury mitigation technology on consumer table saws, believing that such regulation would give SawStop a monopolistic position. Tr. 60–61. In October 2011, the PTI hired Mr. Domeny to advocate for a similar position before Underwriters Laboratories ("UL")[4] and the U.S. Consumer Product Safety Commission ("CPSC")[5] and to consult on related proposed legislation in California. Tr. 36. Mr. Domeny personally supports the position of PTI on this issue. Tr. 61–62.

9.    From 2003 to October 2011, Mr. Domeny represented Bosch in a PTI Joint Venture ("JV") project that developed an alternative to active injury mitigation technology that would not infringe SawStop's patents. Tr. 45, 53–54. After the development of the

---

[3] The Power Tool Institute, Inc., is an independent organization founded to "promote the common business interests of the power tool industry." *Power Tool Institute – Who We Are*, http://www.powertoolinstitute.com/pti_pages/who.asp (last visited Oct. 23, 2012).

[4] Underwriter's Laboratory is a "global independent safety science company," which offers, among other things, "product safety testing and certification." *UL/Product Safety*, available at http://www.ul.com/global/eng/pages/offerings/businesses/productsafety/ (last visited Oct. 23, 2012).

[5] Congress created the U.S. Consumer Products Safety Commission to "protect the public against unreasonable risks of injury associated with consumer products" through product evaluation, injury-related research, and standard setting. *See* 15 U.S.C. § 2051(b). To effectuate the Commission's purpose, it is authorized to "promulgate consumer product safety standards . . . [if] such a standard shall be reasonably necessary to prevent or reduce an unreasonable risk of injury associated with such product." 15 U.S.C. § 2056(a).

alternative technology, the focus of the project turned to developing an acceptable manufacturing process. Tr. 56.

10.    Active injury mitigation technology can be generally conceptualized as two independent processes. The first process must detect contact between the operator and the hazardous component (*i.e.* a spinning saw blade). The second process must expeditiously move the hazard away from the operator. Tr. 54–55.

11.    The PTI JV group completed development of the technology necessary to accomplish both processes by 2009. Tr. 56, 68. Subsequently, a third party developed a method to efficiently manufacture the technology behind the second process, which was finished in October 2011. Tr. 56–57.

12.    Before 2009, Mr. Domeny was extensively involved in the design and development of both technical processes. Tr. 58. Only members of the PTI, however, are allowed to attend PTI Joint Venture ("JV") meetings. After Mr. Domeny ceased working for Bosch, he became ineligible to attend these meetings. Tr. 45. Thus, Mr. Domeny's involvement in the PTI JV project ended, at the latest, when he stopped working for Bosch Management Services. Tr. 53.

13.    In 2011, the PTI filed two patent applications that named Mr. Domeny as an inventor. Tr. 66–67, 182. On November 21, 2011, the PTI filed a patent application titled "Saw Accessories and Clamp for Use Therewith," which is a divisional application that stems from another patent filed on March 25, 2008, and named Mr. Domeny as an inventor. U.S. Patent Application No. 13/301,118. On November 29, 2011, the PTI Filed a patent application titled "Safety Devices for Saws," which named Mr. Domeny as one of the inventors. U.S. Patent Application No. 13/306,892.

14.     Mr. Domeny participates in an internal PTI working group conference call approximately

every Monday. Tr. 39. The members of this working group also include employees of

entities that develop and manufacture power tools and have an interest in the subject,

employees of and consultants for the PTI, and an outside lobbyist. Tr. 40–42. The

purpose of these calls is to discuss the PTI's positions with respect to the proposed UL

standard. Tr. 67–68. Mr. Domeny participates in similar meetings regarding related issues

before the CPSC and the proposed legislation in California. Tr. 76–77.[6]

### C.     Underwriter's Laboratory

15.     At the request of UL, the PTI participates in a working group tasked with evaluating the

performance of active injury mitigation systems. Tr. 69–70.  In October 2011,

Mr. Domeny was hired by the PTI to participate in the UL table saws working group as

one of its representatives. Tr. 36.

16.     On behalf of the PTI, Mr. Domeny co-authored a letter dated October 12, 2012, sent to

UL with Mr. Ted Gogoll. SawStop's Submission of New Evidence, Ex. 1 (Doc. 46)

(SawStop's Post-Hearing Evidence). The October 12th letter commented on the UL's

"Active Injury Mitigation System Draft Proposal." *Id.* In part, the letter sought to

demonstrate how licenses to SawStop's patents would be essential for compliance with

the proposed standard. *Id.*

### D.     Consumer Product Safety Commission

17.     On October 11, 2011, the CPSC published, "Table Saw Blade Contact Injuries; Advance

Notice of Proposed Rulemaking; Request for Comments and Information," which

---

[6] Mr. Domeny testified that he plans to continue to represent the PTI in opposing any future
proposed legislation in California. Tr. 78–79.

requested public comment on a proposed "new performance safety standard . . . to address an unreasonable risk of injury associated with table saws." 76 Fed. Reg. 62678, 62678. The comment period closed on February 10, 2012. *See Table Saw Blade Contact Injuries; Notice of Extension of Time for Comments*, 76 Fed. Reg. 75504-01 (December 2, 2011).

18.    When evaluating a proposal that would mandate the incorporation of a safety measure, the CPSC considers the "societal cost" of that incorporation, a holistic approach. Tr. 83.

19.    The PTI hired Mr. Domeny in October 2011 to work on matters related to the CPSC. Tr. 36.

## II.    Conclusions of Law

### A.    Standards

Under the Federal Rules of Civil Procedure the potential scope of permissible discovery is broad. Fed. R. Civ. Pro. 26(b)(1) (Generally, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."). Upon a showing of "good cause," however, Rule 26(c) gives a court substantial latitude in directing or limiting discovery. *Id.* at 26(c) ("The court may, for good cause, issue an order to protect a party from annoyance, embarrassment, oppression, or undue burden or expense."). The court is explicitly empowered to issue an order requiring confidential information "not be revealed or revealed only in a specified way." *Id.* at 26(c)(1)(G).

Although a court may compel the production of confidential information, it may simultaneously restrict those who may access that confidential information. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) (holding that good cause includes "protection from misuse of trade secrets by competitors"). When a party is concerned

about the competitive misuse of confidential information and a protective order appears to be insufficient protection, the court must balance the risk of disclosure to competitors against the risk of damaging the claims or defenses of the party seeking access. *See id.* A court must "examine factually all the risks and safeguards surrounding inadvertent disclosure" before granting or denying access to confidential information to in-house counsel, an expert witness, or another litigation participant. *Id.*

The Ninth Circuit, following the Federal Circuit, held that a "crucial factor" in evaluating the risk of inadvertent disclosure is whether the person seeking access "was involved in 'competitive decision-making'; that is, *advising on decisions about pricing or design* 'made in light of similar or corresponding information about a competitor.'" *Id.* (quoting *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984) (emphasis added).[7]

## B.    Discussion

Where the parties have stipulated to a protective order, "the party opposing disclosure has the burden of establishing that there is good cause to continue the protection of the discovery material." *In re Roman Catholic Archbishop of Portland*, 661 F.3d 417, 424 (9th Cir. 2011) *cert. denied*, 132 S. Ct. 1867 (U.S. 2012). SawStop opposes disclosure of its confidential information to Mr. Domeny; thus, it has the burden to show why the risk of disclosure outweighs the risk of harm to Grizzly's case. *Cf. In re Deutsche Bank Co. Americas*, 605 F.3d 1373, 1378–79 (Fed. Cir. 2010) (party seeking to include a patent prosecution bar provision in a protective order has the burden to show good cause).

---

[7] In *U.S. Steel*, the Federal Circuit defined "competitive decision-making" to include, among other things: "a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel*, 730 F.2d at 1468 n.3.

Assuming *arguendo* that the documents Grizzly seeks to disclose to Mr. Domeny are protectable under Rule 26(c), SawStop has failed to offer any persuasive evidence that Mr. Domeny will violate the protective order by intentionally disclosing its confidential information. Although SawStop attempts to identify inconsistencies in Mr. Domeny's testimony, the Court finds that any such inconsistencies are minor and immaterial and not detrimental to Mr. Domeny's credibility. Instead, the Court finds Mr. Domeny to be a credible witness and accepts his representation that he will abide by the terms of the protective order. Additionally, Mr. Domeny has been subject to prior protective orders, arising from other litigation and joint ventures, and has never been accused of violating one. Tr. 94. Therefore, the Court concludes that Mr. Domeny will abide by the protective order, which negates the risk of Mr. Domeny intentionally disclosing SawStop's confidential information.

The Court, however, must also consider the issue of "inevitable disclosure," that is whether Mr. Domeny can "lock-up [the confidential information] in his mind, safe from inadvertent disclosure." *Brown Bag*, 960 F.2d at 1471. The Court must balance the risk to SawStop of inadvertent disclosure against the risk that Grizzly will be hindered in presenting its case. *See id.* at 1470.

### 1.    Risk of Inadvertent Disclosure

The parties disagree about whether Mr. Domeny is a "competitive decision-maker." SawStop argues that Mr. Domeny is a competitive decision-maker, and thereby not independent under the terms of the protective order, because he is working for its competitors under the auspices of the PTI and that he is personally and professionally opposed SawStop's active injury mitigation technology being required on consumer table saws. SawStop's Post-Hearing Mem. 11–12. Doc. 44.

A competitive decision-maker is one who "advis[es] on decisions about pricing or design '*made in light of similar or corresponding information* about a competitor.'" *Brown Bag*, 960 F.2d at 1470 (quoting *U.S. Steel*, 730 F.2d at 1468 n.3) (emphasis added). A risk of inadvertent disclosure arises not from an information recipient's position or influence with a competitor of the party opposing disclosure, but from being in a position where the subtle percolation of the confidential information can tangibly and unavoidably alter the recipient's actions. *Cf. FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980) ("'[I]t is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the recipient."). In the classic scenario, a decision-maker may learn how a competitor prices its product and despite the decision-maker's best conscious effort his or her future pricing decisions may be made in partial reliance on that information. *See, e.g.*, *Brown Bag*, 960 F.2d at 1471 (inquiring whether the in-house counsel could "lock-up trade secrets in his mind").

As SawStop has established, Mr. Domeny is involved with an organization, the PTI, whose membership is composed of SawStop's competitors in the table saw market. Tr. 40–45. The PTI hired Mr. Domeny as a consultant to advance its opposition to regulatory and administrative efforts to mandate active injury mitigation technology. Tr. 36, 60–61.[8] Mr. Domeny's activities with the PTI place him in a competitive relationship with SawStop. A competitive relationship alone, however, is not sufficient to find that Mr. Domeny will inadvertently disclose SawStop's confidential information. *See Brown Bag*, 960 F.2d at 1470–71.

---

[8] Mr. Domeny was involved with the PTI JV project through 2011, which was charged with developing an alternative to SawStop's active injury mitigation system. Tr. 45, 53–54. Mr. Domeny's involvement in that project ended with his retirement from Bosch; further, the project later entered the tool engineering phase, which is being handled by a third party and is outside of Mr. Domeny's expertise and involvement. Tr. 56, 171. Outside of the JV project, Mr. Domeny testified that he had no involvement with product development now that he is in retirement. Tr. 121.

In addition to being in a competitive relationship, Mr. Domeny must be acting as a *decision-maker*. *See id.* Although Mr. Domeny's role with the PTI and his substantial experience with power tool manufacturers places him in contact with competitive decision-makers, those contacts are insufficient to make Mr. Domeny himself a decision-maker. *See Matsushita Elec. Indus. Co., Ltd. v. United States*, 929 F.2d 1577, 1580 (Fed. Cir. 1991) ("[T]he standard is not 'regular contact' with other corporate officials who make 'policy,' or even competitive decisions, but 'advice and participation' in 'competitive decision-making.'"). Instead, Mr. Domeny must be in a position to effectuate or direct decisions made using knowledge that is tainted by SawStop's confidential information. *Cf. In re Deutsche Bank*, 605 F.3d at 1379–81 (distinguishing between attorneys that "craft[] the content of patent applications" and those with "high-altitude oversight of patent prosecution").[9] At most, Mr. Domeny may be in a position to help shape the strategy used by the PTI to promote its interests before UL, the CPSC, and the state of California. In doing so, however, Mr. Domeny is not in a position likely to result in the inadvertent disclosure of SawStop's confidential information.

SawStop lists a myriad of ways in which Mr. Domeny could utilize SawStop's confidential information and cause SawStop competitive harm. *See* SawStop's Post-Hearing

---

[9] Although this conclusion at first appears to be in tension with *Brown Bag*, which held that the *advice* given by a party's in-house counsel was competitive decision-making, Mr. Domeny's involvement with the PTI, Bosch, and other power tool manufacturers is factually different. *See Brown Bag*, 960 F.2d at 1471. The in-house counsel in *Brown Bag* was the company's "sole legal advisor," who was responsible for advising the company on "contract, employment, and competitive marketing decisions." *Id.* Mr. Domeny's role is substantially more circumscribed because he is retained by SawStop's competitors for discrete projects where his expertise is appreciated, but his influence is limited. Tr. 35–36 (Mr. Domeny was serving as a litigation consultant and the PTI's advocate on a select issue); *see also* Tr. 126 (Mr. Domeny was not involved in selecting the PTI's lobbyist for the active injury mitigation technology issue). Moreover, Mr. Domeny's role as an outside consultant limits his sphere of influence. *See, e.g.*, SawStop's Post-Hearing Evidence, Ex. 1 (letter written by Mr. Domeny and Mr. Gogoll, director of compliance at Black and Decker); Tr. 43; Tr. 135–38 (discussing Mr. Domeny's role as a fact-checker for a PTI Fact Sheet in concert with other PTI employees).

Mem. 2–4. Common among all of the examples, and fatal to SawStop's argument, is the requirement that Mr. Domeny act affirmatively to *communicate* to others SawStop's confidential information in violation of the express provisions of the terms of the Court's protective order. SawStop argues that Mr. Domeny could "ask a particular question of a colleague" or "suggest a line of technical inquiry." *Id.* at 2. These examples, however, simply describe potentially surreptitious behavior intended to violate the protective order, but they do not demonstrate inadvertence. *See Brown Bag*, 960 F.2d at 1471 ("Knowledge of Symantec's trade secrets would place in-house counsel in the 'untenable position' of having to refuse his employer legal advice . . . lest he improperly or indirectly reveal [those] trade secrets.").

SawStop suggests that the PTI's strategy in opposing regulations and standards mandating SawStop's technology could be influenced by Mr. Domeny's access to SawStop's confidential information. The type of information at issue, however, is not amenable to inadvertent disclosure because the information that could cause SawStop competitive harm—for example, if it were given to UL or the CPSC—is limited to specific values. For example, the CPSC, in theory, could use information revealing the true cost to integrate SawStop's technology into existing table saws as part of its decision-making process. Tr. 83. Mr. Domeny, however, is in no position to inadvertently disclose that such specific dollar-amount information. If Mr. Domeny were a member of the CPSC, UL, or a California legislator, then he could, perhaps, be in a position inadvertently to use that information in reaching a decision because it would be irrevocably present in his mind, but as an outside advocate Mr. Domeny may only communicate, or in any other way use, that information through an affirmative act. *Cf. In re Deutsche Bank*, 605 F.3d at 1379–81 (distinguishing between attorneys that "craft[] the content of patent applications" and those with "high-altitude oversight of patent prosecution"). Moreover,

Mr. Domeny is already attempting to persuade UL, the CPSC, and the California Legislature that integrating SawStop's technology would be prohibitively expensive and his knowing a specific added cost, but being forbidden from revealing it would do nothing to alter that strategy.

For these reasons, the Court concludes there is no reasonable likelihood that Mr. Domeny would inadvertently disclose SawStop's confidential information.

### 2.    Risk of Prejudice to Grizzly

Grizzly argues that Mr. Domeny's experience in the power tool industry and familiarity with SawStop make him uniquely qualified to oppose Dr. Gass's expert testimony in the underlying litigation. *See* Grizzly's Post-Hearing Br. 11–12. (Doc. 42.) Further, Grizzly argues that the impending trial date in January 2013 makes it unreasonably burdensome, indeed impossible, to locate an acceptable replacement. *See* Grizzly's Pre-Hr'g Br. 11–15. In response, SawStop proposes several alternatives to Mr. Domeny's receipt of its confidential information and argues that Grizzly's timing-induced prejudice is self-inflicted. *See* SawStop's Post-Hearing Mem. 12–14.

In assessing the risk to the party seeking disclosure, the court must consider "the nature of the claims and [the] party's opportunity to develop its case through alternative discovery procedures." *Brown Bag*, 960 F.2d at 1470. In *Brown Bag*, the court found insufficient prejudice to overcome a risk of inadvertent disclosure where: (1) the party seeking disclose had outside counsel that had spent six months studying the confidential information, giving the party ample time to prepare for the court-ordered summary judgment deadline; (2) the trade secrets were not themselves relevant to the party's claims; and (3) the presiding judge provided for a method for the in-house counsel to obtain any relevant documents. *See Brown Bag*, 960 F.2d at 1471.

In the underlying *Santella* litigation, expert disclosures were due by April 2012 and the case is scheduled to go to trial in January 2013. Grizzly's Pre-Hr'g Br., Ex. D, ¶ 4, 8. Although Grizzly has identified five testifying experts in various subject matters, it has only sought to disclose SawStop's confidential information to Mr. Domeny and one other expert. *Id.* at 11–12. SawStop argues that Grizzly was in a position to mitigate the prejudice resulting from a truncated litigation timeframe because Grizzly designated Mr. Domeny as an expert. SawStop's Post-Hearing Mem. 12–13.  Mr. Domeny, however, has testified in opposition to Dr. Gass in at least two prior cases, which belies SawStop's argument that this challenge to Mr. Domeny's independence was foreseeable. Tr. 30–31. Indeed, Mr. Domeny's competitive role only has decreased since his retirement, which implies he is even more independent now than he was previously. *E.g.*, Tr. 35. Although Grizzly might have been able to choose an expert to whom SawStop did not object, Grizzly was under no obligation to do so. Thus, the Court will consider the prejudice to Grizzly arising from the need to try to replace Mr. Domeny ahead of a January 2013 trial date.

In Plaintiffs' case-in-chief, they will be required to prove that a safer alternative design, presumably incorporating active injury mitigation technology, was economically and technologically feasible when the saw left Grizzly's control. *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a),(b); *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 433 (Tex. 1997) (holding a product is not unreasonably dangerous as a matter of law if no safer design exists) *superseded by statute on other grounds*, Tex. Civ. Prac. & Rem. Code § 82.004, *as recognized in Green v. R.J. Reynolds Tobacco Co.*, 274 F.3d 263, 265 (5th Cir. 2001). Dr. Gass opined in a report prepared for Plaintiffs that it was economically and technologically feasible to incorporate SawStop's technology into the Grizzly table saw that injured Mr. Santella. Grizzly's Am. Br.

Supp. Mot. Compel Discovery, Ex. A, ¶ 64–66. (Doc. 4.) Aside from offering his own expert opinion, Mr. Domeny's testimony is intended to rebut Dr. Gass's testimony. *See* Grizzly's Pre-Hr'g Br. 12.

Further, a significant portion of Mr. Domeny's value as an expert witness results from his ability to testify with personal reference to the state of the industry during the relevant period—the release of the saw that injured Mr. Santella and the development and release of SawStop's technology. *E.g.*, Tr. 191. As the nature of Plaintiffs' suit requires inquiry into the state of the art during a prior time period, Mr. Domeny's involvement in the power tool industry during that period is important to Grizzly's defense. Further, his unique insights might be lost if, as SawStop suggests, he is required to filter his knowledge through a SawStop-approved intermediary. *See, e.g.*, *Biovail Labs.Int'l SRL v. Abrika, LLLP*, 04-61704-CIV, 2007 WL 788849, at *4 (S.D. Fla. Mar. 14, 2007) (finding a low risk of prejudice where at least one of the party's seven experts had "a background and experience similar to" the excluded expert). Thus, Mr. Domeny's ability to review SawStop's confidential information is an important part of Grizzly's defense.

For these reasons, the Court concludes that denying Mr. Domeny access to SawStop's confidential information will unreasonably limit and impair Grizzly's ability to defend itself at trial.

## CONCLUSION

Balancing the risks, the Court finds that the risk of unfair prejudice to Grizzly's ability to defend against Plaintiffs' claims outweighs the potential of inadvertent disclosure of SawStop's confidential information. Accordingly, Grizzly's Amended Motion to Compel (Doc. 4) is GRANTED in further part as follows: upon Mr. Domeny's execution of Exhibit A to the protective order (Doc. 16), Mr. Domeny may be given access to SawStop's confidential

Page 16 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

documents received in discovery by Grizzly, including SawStop's documents marked

"Attorneys' Eyes Only."

     IT IS SO ORDERD.

     Dated this 5th day of November, 2012.

                    /s/ Michael H. Simon

                    Michael H. Simon
                    United States District Judge